DAN SIEGEL, SBN 56400
SONYA MEHTA, SBN 294411
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
danmsiegel@gmail.com
sonyamehta@siegelyee.com

Attorneys for Plaintiff
GABRIELLE NEVITT, Ph.D.

# UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIELLE NEVITT, Ph.D., | Case No.: |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | (Civil Rights) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiff GABRIELLE NEVITT, Ph.D., complains against defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, as follows:

**PRELIMINARY STATEMENT**

1. Gabrielle Nevitt, Ph.D., brings this action against defendant The Regents of the University of California for terminating her from the Graduate Group in Ecology at the University of California at Davis, bringing disciplinary charges against her when she challenged the termination, rejecting a Committee on Privilege & Tenure recommendation, and imposing punishment contrary to that recommendation due to

---

*Nevitt v. The Regents of the University of California*, No.
Complaint – 1

gender discrimination and retaliation for her complaints of gender discrimination and other protected acts.

## JURISDICTION

2. This action arises under Title VII, 42 U.S.C. § 2000e *et seq.*, and Title IX, 20 U.S.C. § 1681 *et seq*. The Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. The state law claims here are so related to claims in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.

## VENUE

4. Venue is proper in the Eastern District of California because the events or omissions giving rise to the claim occurred in this District.

## PARTIES

5. At all times relevant to this controversy, plaintiff GABRIELLE NEVITT, Ph.D., was a tenured professor at University of California Davis and a resident of Winters, California.

6. At all times relevant to this controversy, defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA was a state agency whose authority is derived from the California Constitution, Article IX, § 9, which owns and operates the University of California and all of its campuses.

## STATEMENT OF FACTS

7. The University of California at Davis (UC Davis) has employed Dr. Gabrielle Nevitt for over 25 years, including as a tenured Full Professor in the Department of Neurobiology, Physiology and Behavior in the College of Biological Sciences.

8. Dr. Nevitt is internationally recognized as a preeminent scientist and scholar. She has a long and impressive history of success in important ecological matters, and no record of discipline before defendant's retaliation.

9. Dr. Nevitt specializes in the sensory ecology of marine organisms and how they interact with a changing environment. Her current work focuses on how seabirds and fishes use olfaction to forage, navigate and chose their mates. Many of the species she studies are threatened or endangered.

10. Dr. Nevitt was a vital and extremely active faculty member of the UC Davis Graduate Group in Ecology (GGE) for at least ten years. She served on the GGE Executive Committee from 2006-2008.

11. The UC Davis GGE is the largest and most comprehensive ecology graduate training group of its kind. It is organized into nine Areas of Emphasis (AOE).

12. Since 2009, Dr. Nevitt had been Chair of the AOE in Marine Ecology, the largest AOE in the GGE. While Dr. Nevitt's home department was the Department of Neurobiology, Physiology and Behavior (NPB), she drew her graduate students primarily through the GGE.

13. The NPB faculty was and remains at least 75% male. GGE faculty is also historically majority male.

14. NPB failed to hire women. Several women who it did hire left NPB because of the overwhelming sexism they experienced, in both hiring and promotion. At least two women left due to NPB's failure to promote women.

15. Indeed, having spent her whole career at UC Davis, Dr. Nevitt is the most senior woman professor at NPB at pay step 5.5 out of the highest possible steps of 9.5 and Above Scale. With the exception of one woman who moved into administration, every woman senior to Dr. Nevitt has left or retired early.

16. NPB promoted men at earlier ages than women. Men who are younger and arguably less accomplished than Dr. Nevitt are already at step 9.5.

17. NPB also denied women opportunities for advancement. In 25 years, it never asked Dr. Nevitt to lead a search committee on her own, whereas many of her male colleagues have led multiple searches for new faculty members and their disciplines are well represented in the department.

18. In June 2015, the GGE Executive Committee (EC) approved a new Graduate Group in Marine Sciences. The GGE EC, including Professor Edwin Grosholz, made this decision without informing Dr. Nevitt.

19. The new Graduate Group was duplicative of Dr. Nevitt's existing Marine Ecology AOE.

20. The GGE EC stated that it had no need to inform her of the creation of the new Graduate Group because Jay Stachowicz, a male faculty member and the Chair of Marine Ecology several years prior to Dr. Nevitt, had been present.

21. In or around August 2015, Dr. Nevitt met with Professor Edwin Grosholz, now the new Chair of the GGE, to discuss the new Graduate Group. Dr. Nevitt indicated to GGE Chair Grosholz that it was duplicative of the existing AOE, it needed to be openly discussed, and it likely negatively impacted the existing Marine Ecology AOE. She told him the EC not telling her about it was inappropriate and disrespectful.

22. Dr. Nevitt also informed the GGE EC that she was going on sabbatical in 2015-16.

23. Dr. Nevitt agreed to meet in September 2015 about the new Graduate Group, reminding GGE Chair Grosholz that she was on sabbatical, so she could attend only that one meeting.

24. On October 12, 2015, Dr. Nevitt met with her department chair, Dr. Martin Usrey, to inform him that a male NPB faculty member was engaging in sex discrimination against her by telling her students she was too demanding and otherwise undermining and badmouthing her and her laboratory.

25. Later, she also reported that students had called her sexist curse words.

26. NPB Chair Usrey dismissed all her concerns and took no action.

27. On September 29, 2015, Dr. Nevitt met with GGE Chair Grosholz and others to discuss the proposed new Graduate Group. In fact, the GGE EC had already approved the Graduate Group without informing Dr. Nevitt.

28. In October 2015, Dr. Nevitt reminded GGE Chair Grosholz that she was on sabbatical and another faculty needed to take over as Chair of Marine Ecology that year.

*Nevitt v. The Regents of the University of California*, No.
Complaint – 4

GGE Chair Grosholz declined to consider several male faculty members that were suggested, stating that they could not do it because they were on sabbatical.

29. On February 10, 2016, Dr. Nevitt wrote to GGE Chair Grosholz about her sabbatical replacement, "So as we left things, nobody, meaning, none of the guys, wanted to be Chair of this AOE despite the strong interest in Marine Ecology. So I am trying to fit it in but I have also got a lot of traveling … . I am on sabbatical."

30. GGE Chair Grosholz never secured a substitute for Dr. Nevitt, forcing her to attend the meetings and perform the work of a GGE Chair of an AOE although she was on sabbatical. The work was complicated and time consuming.

31. On February 10, 2016, GGE graduate student Sean Clemenza informed Dr. Nevitt that his advisor was retiring and asked her if she would take over as Chair of his thesis committee. Dr. Nevitt was on Mr. Clemenza's thesis committee and was aware that he was in good standing. After discussing the matter with Mr. Clemenza's advisor and securing permission from graduate studies, Dr. Nevitt wrote to GGE Chair Grosholz that she could serve as Chair for Mr. Clemenza.

32. Following this email from Dr. Nevitt and also on February 10, 2016, GGE Chair Grosholz informed Mr. Clemenza that GGE was dismissing him from the Ph.D. program. He had not previously informed Dr. Nevitt of this, and the student was in good standing. Mr. Clemenza was a part-time, self-funded student with small children who had already paid $120,000 in tuition.

33. GGE Chair Grosholz had unilaterally made the decision to dismiss Mr. Clemenza, in violation of University policy.

34. Dr. Nevitt made every effort to help Mr. Clemenza. She spoke to the Associate Dean of Graduate Studies Jean-Pierre Delplanque asking him to explain the dismissal and stating she wished the process to be properly executed.

35. She expressed to him her fear of retaliation from GGE Chair Grosholz if she was assigned to Chair Mr. Clemenza's thesis committee. Dr. Nevitt had told GGE Chair

Grosholz she wanted the process to be "above-board." AD Delplanque said he would speak to GGE Chair Grosholz and assured her there would be no retaliation against her.

36. She expressed her fear of retaliation by GGE Chair Grosholz to AD Delplanque at least through March.

37. On March 1, 2016, Mr. Clemenza informed GGE Chair Grosholz that he would like Dr. Nevitt to chair his committee. That day, GGE Chair Grosholz wrote to Dr. Nevitt to complain that she had decided this "without consulting him" and "working behind [his] back is not a recipe for success."

38. On March 15, 2016, Dr. Nevitt wrote to AD of Graduate Studies Delplanque that she would chair Mr. Clemenza's committee if a reasonable timeline for completion of his Ph.D. requirements was established by committee, not arbitrarily by GGE Chair Grosholz.

39. That day, GGE Chair Grosholz wrote to Dr. Nevitt and Mr. Clemenza that he was requiring Mr. Clemenza to sign an agreement stating that he would agree to dismissal from the program and relinquish his rights to an objection or appeal if Mr. Clemenza could not satisfy GGE Chair Grosholz's arbitrary and unilateral schedule.

40. On March 23, 2016, Dr. Nevitt objected to GGE Chair Grosholz's demand of Mr. Clemenza to him and AD of Graduate Studies Delplanque. They responded denying that Dr. Grosholz had made any such demand.

41. By this time, Dr. Nevitt had organized Mr. Clemenza's thesis committee to create a reasonable schedule for Mr. Clemenza to complete his degree. Dr. Nevitt, AD of Graduate Studies Delplanque, GGE Chair Grosholz, and Mr. Clemenza met to finalize the schedule, and GGE Chair Grosholz again demanded Mr. Clemenza sign away his rights on a form he had brought. AD Delplanque told GGE Chair Grosholz this was illegal. GGE Chair Grosholz later denied asking Mr. Clemenza to sign the document.

42. On August 3, 2016, GGE Chair Grosholz informed Dr. Nevitt that he was dismissing her from the GGE after 10 years of service. The dismissal letter claimed there were "mentoring issues." It stated her current students would not be impacted but she

could not take on any new GGE students.

43. Without students, Dr. Nevitt could not run her lab, effectively compete for NSF grants, or do her work.

44. Dr. Nevitt had never been disciplined or experienced problems of any kind. Dr. Nevitt had six GGE students, mostly working on her National Science Foundation funded projects and on work closely related to her core research topics. They were all performing satisfactorily.

45. On August 4 and 5, 2016, Dr. Nevitt reported Prof. Grosholz's action, which she in good faith believed was retaliation for speaking on behalf of Mr. Clemenza, gender discrimination, and violation of UC policy, to the UC Davis Title IX office.

46. On August 7, 2016, AD of Graduate Research Delplanque and Associate Dean of Graduate Groups (ADGG) Chris Calvert met with Dr. Nevitt. AD Delplanque's stated intent was to discuss the specific reason for Dr. Nevitt's dismissal from the GGE.

47. Instead, both Associate Deans claimed they had no information but stated that the matter stemmed from a GGE faculty member. They assured Dr. Nevitt the sanction would not affect current students.

48. Dr. Nevitt asked them whether the decision to dismiss her was made by GGE Chair Grosholz alone, in violation of the GGE bylaws which require an EC majority vote.

49. The unfair sanction damaged her chances for promotion.

50. On August 9, 2016, Associate Dean of Graduate Groups (ADGG) Chris Calvert wrote to Dr. Nevitt and others "re: need help quickly to protect students" that Dr. Nevitt must not engage in retaliation, harassment, or intimidation against students, implying she had done so although she never had and there was no evidence of this behavior.

51. On August 12, 2016, Dr. Nevitt filed an appeal of her dismissal with the GGE EC asking to speak to them which was her right. She also reported the continuing retaliation to AD Delplanque.

52. A GGE EC member told Dr. Nevitt GGE Chair Grosholz had instructed her not to discuss the unilateral expulsion with Dr. Nevitt.

53. In September 2016, a new student wrote to Dr. Nevitt to tell her how excited he was to join her lab. After a week-long trip with GGE Chair Grosholz, the student wrote to her that he was changing labs, without explanation.

54. On October 4, 2016, GGE Chair Grosholz wrote to Dr. Nevitt that the GGE Executive Committee was expelling her. He stated that his unilateral dismissal had been noncompliant with GGE bylaws, but he had now held a vote, and the dismissal was now compliant.

55. On October 7, 2016, GGE Chair Grosholz sent an email to all of Dr. Nevitt's students, except Mr. Clemenza, stating Dr. Nevitt was no longer their advisor and they could not complete their Ph.D. degrees under her. He did not copy Dr. Nevitt.

56. This effectively gutted Dr. Nevitt's lab and her National Science Foundation-funded projects.

57. The email instructed these students to keep the information secret from Dr. Nevitt. She only found out because a student became emotional and told her.

58. GGE Chair Grosholz separated Dr. Nevitt from students who had been in her lab for six years and were graduating that quarter. Four of these students worked on an National Science Foundation-funded project and represented a considerable investment of Dr. Nevitt's time and resources. It was sent the same day Dr. Nevitt's group would have been celebrating a major publication from the lab.

59. Dr. Nevitt was so physically and emotionally distressed she went to an Urgent Care health facility.

60. On October 13, 2016, Dr. Nevitt met with AD Delplanque, AD Calvert, and another Associate Dean to report the actions of GGE Chair Grosholz. AD Delplanque stated there were no charges or accusations against Dr. Nevitt.

61. On October 20, 2016, Dr. Nevitt filed a grievance with the Committee on Privilege & Tenure.

62. On November 20, 2016, Dr. Nevitt filed an appeal through the Graduate Council about her expulsion from the GGE.

*Nevitt v. The Regents of the University of California*, No.
Complaint – 8

63. On January 12, 2017, Dr. Nevitt met with the Dean of Graduate Studies and Chair of Graduate Council regarding her appeal of the GGE EC's dismissal. They provided no information about or opportunity to remediate her supposed poor behavior. Dr. Nevitt still had no idea what the alleged "mentoring issues" concerned.

64. The Dean of Graduate Studies suggested that Dr. Nevitt file a document request if she wanted to know the basis of the complaint. Dr. Nevitt immediately filed this request.

65. In January 2017, AD of Graduate Studies Delplanque and GGE Chair Grosholz retaliated against Dr. Nevitt by instigating a baseless disciplinary investigation through the Office of the Vice Provost.

66. On January 13, 2017, Dr. Nevitt received a letter from GGE Chair Grosholz dismissing her from the thesis committee of graduate student Matthew Savoca, stating that she exceeded the time limit for responding to two requests from Mr. Savoca concerning his thesis chapter, despite Dr. Nevitt having notified the department and the student that she was experiencing health problems. GGE Chair Grosholz's dismissal of Dr. Nevitt from the thesis committee was an unprecedented and unjustified action.

67. From February 20 to 28, 2017, Dr. Nevitt communicated with the Office of the Vice Provost regarding her need to go on medical leave for surgery.

68. On March 2, 2017, Vice Provost Maureen Stanton advised Dr. Nevitt that the University was investigating her conduct for a potential disciplinary sanction. The letter made inflammatory and untrue claims that Dr. Nevitt had been abusive to students and colleagues in a multitude of ways.

69. Dr. Nevitt received this letter minutes before going to the hospital for surgery.

70. On March 4, 2017, Dr. Nevitt's mother suffered a medical emergency requiring hospitalization for several days after reading Vice Provost Stanton's letter.

71. From March 7, 2017, to June 15, 2017, Dr. Nevitt took medical leave.

72. In August 2017, Dr. Nevitt met with NPB Department Chair Usrey, Associate Dean of Research Greg Recanzone, and College of Biological Sciences Dean Mark Winey. She pleaded with them to explain the "mentoring issues" and why she had never

been given a chance to address the supposed issue. She told them instead of following policy, the administration had psychologically tortured her and destroyed her research program.

73. She told them the NPB Department and the Office of Research had been obstructing a NASA contract, which cost nothing to the University, that was required for her to complete the objectives of one of her NSF funded projects.

74. Dr. Nevitt also reported that Co-Principal Investigator Associate Dean Susan Ebeler had refused to attend project meetings, disallowed her access to data, and disrespected her as the lead PI on a multi-investigator project.

75. In September 2017, Associate Dean of Research Gregg Recanzone mediated project meetings between Dr. Nevitt and Co-Principal Investigator Ebeler but after three meetings Professor Ebeler stopped attending. Recanzone told Dr. Nevitt to contact the NSF program officer about it. He suggested Dr. Nevitt move to the English Department.

76. From then to the end of December 2018, Professor Ebeler declined to work collaboratively or to provide Dr. Nevitt access to National Science Foundation (NSF) data from their grant.

77. In September 2017, Dr. Nevitt submitted her Step 6.5 promotion package for review by her department, NPB. NPB Department Chair Usrey and the Dean of the College of Biological Sciences Mark Winey added negative and inaccurate letters in the promotion package.

78. Applicants for promotion typically hear the result within six months of applying.

79. On or about December 1, 2017, NPB Department Chair Usrey allowed the recitation of the investigation accusations against Dr. Nevitt to faculty members at a meeting while they discussed her Step 6.5 promotion package. NPB Department Chair Usrey later threatened the professor with disciplinary action for telling Dr. Nevitt.

80. Around this time, the Committee on Privilege and Tenure notified Dr. Nevitt it had denied her grievance against GGE Chair Grosholz, filed more than a year before.

81. On December 20, 2018, Associate Vice Provost (AVP) Philip Kass notified Dr.

1  Nevitt the University was placing her on paid administrative leave.

2      82.  The Office of the Vice Provost had taken 22 months to complete its investigation.

3      83.  On January 4, 2019, Dr. Nevitt requested a Committee on Privilege & Tenure
4  hearing regarding the supposed "mentoring issues."

5      84.  In or around March 16, 2019, Dr. Nevitt reported the sex discrimination to NSF
6  and requested assistance.

7      85.  In April 2019, the University denied Dr. Nevitt's promotion to Step 6.5, two years
8  after she had applied. The delay had denied her the opportunity to reapply in 2018.

9      86.  On May 2 and 3, 2019, the Committee on Privilege & Tenure finally held a two-
10 day Committee on Privilege & Tenure hearing on the accusations against Dr. Nevitt.

11     87.  The hearing evidence suggested GGE Chair Grosholz convinced a group of
12 students to turn against Dr. Nevitt by lying to them about her support for them.

13     88.  Former and current NPB faculty testified to the sexist conditions and
14 mishandling of Dr. Nevitt's promotion.

15     89.  On May 28, 2019, the Chair of the Committee on Committees invited Dr. Nevitt
16 to be a member of the Undergraduate Council, an important Senate Committee. The
17 Chair then quickly rescinded the offer.

18     90.  On June 20, 2019, the Committee on Privileges & Tenure unanimously rejected
19 all the charges against Dr. Nevitt and recommended the Chancellor dismiss them.

20     91.  On July 18, 2019, the University notified Dr. Nevitt that she was no longer the
21 instructor for the Antarctic study abroad program. She had proposed this new program
22 and had previously been listed as the instructor of record on the Study Abroad program
23 website.

24     92.  On August 22, 2019, NSF notified Dr. Nevitt that she was removed from her only
25 current NSF grant. CBS Dean Winey was made the Principal Investigator of her grant.
26 He did not contact her and had no background in the field.

27     93.  On October 16, 2019, the National Science Foundation notified Dr. Nevitt that a
28 final progress report had been approved for her NSF grant, and terminated the grant.

Dean Winey had never discussed this report with her.

94. On December 3, 2019, UC Davis Chancellor Gary May overruled the Committee on Privilege & Tenure's recommendation to dismiss all charges against Dr. Nevitt. Instead, he sanctioned Dr. Nevitt with a three-month suspension, unless she agreed to a remediation program. Dr. Nevitt agreed to the program.

95. On January 6, 2020, NPB Chair Marty Usrey instructed Dr. Nevitt to co-author and comment on a paper from one of the graduate students who had falsely accused her at the Committee hearing. It seemed to state Dr. Nevitt would have to do so to access graduate programs and students in the future.

96. On January 13, 2020, AVP Kass assigned former Vice Provost (VP) emerita Stanton as Dr. Nevitt's mentor for the remediation.

97. VP Stanton is the same person who ordered the investigation against Dr. Nevitt. The University refused Dr. Nevitt's request to work with any neutral mentor uninvolved with the case, despite her doctor's support for this request.

98. Over the next few months, Dr. Nevitt met with VP Stanton several times. She repeatedly asked VP Stanton for a plan or syllabus but VP Stanton had none.

99. In 2019 and 2020, members of the College of Biological Sciences Faculty Executive Committee (FEC) contacted Dr. Nevitt to speak to the FEC about her experiences. Dr. Nevitt finally and reluctantly agreed.

100. On May 26, 2020, CBS Dean Mark Winey warned Dr. Nevitt about violating her leave by requesting a meeting with the FEC, which she had not done. He later stated that Dr. Nevitt should not talk about her experiences except by filing a Committee on Privilege & Tenure grievance. On June 1, 2020, Dr. Nevitt returned to UC Davis.

101. On June 23, 2020, CBS Dean Winey notified Dr. Nevitt that he was disallowing her from supervising undergraduate or graduate students or postdoctoral fellows in her lab, severely harming her work.

102. Dr. Nevitt has never had a significant gap in funding since coming to UC Davis. The University's removal of and lack of support for her grants has damaged her ability to

1 obtain NSF grants in the future.

2   103. If the University finally promotes her, Dr. Nevitt will be one of only two women NPB has ever promoted above Step 6 in the 25 years that she has been faculty there.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

104. On April 28, 2020, the Department of Fair Housing and Employment issued Dr. Nevitt a right to sue letter.

105. On September 22, 2020, the Equal Employment Opportunity Commission issued Dr. Nevitt a right to sue letter.

## FIRST CLAIM – TITLE IX RETALIATION
(20 U.S.C. § 1681 *et seq.*)

106. Plaintiff incorporates by reference all paragraphs above as though fully set forth herein.

107. By virtue of the foregoing, defendant retaliated against plaintiff for her speech complaining about gender discrimination.

## SECOND CLAIM – TITLE VII DISCRIMINATION
(42 U.S.C. § 2000e *et seq*)

108. Plaintiff incorporates by reference all paragraphs above as though fully set forth herein. By virtue of the foregoing, defendant discriminated against plaintiff on the basis of gender.

## THIRD CLAIM – TITLE VII RETALIATION
(42 U.S.C. § 2000e *et seq*)

109. Plaintiff incorporates by reference all paragraphs above as though fully set forth herein.

110. By virtue of the foregoing, defendant retaliated against plaintiff because of her complaints about gender discrimination.

## FOURTH CLAIM – FEHA GENDER DISCRIMINATION
(California Government Code § 12940(a))

111. Plaintiff incorporates by reference all paragraphs above as though fully set forth

in this claim.

112. By virtue of the foregoing, defendant discriminated against plaintiff based on her gender in violation of Government Code section 12940(a).

### FIFTH CLAIM – FEHA RETALIATION
(California Government Code § 12940(h))

113. Plaintiff incorporates by reference all paragraphs above as though fully set forth in this claim.

114. By virtue of the foregoing, defendant retaliated against plaintiff in violation of Cal. Gov't Code § 12940(h).

### SIXTH CLAIM – FAILURE TO PREVENT RETALIATION
(California Government Code §§ 12940(j)(1) & (k))

115. Plaintiff incorporates by reference all paragraphs above as though fully set forth in this claim.

116. By virtue of the foregoing, defendant failed to prevent retaliation against plaintiff in violation of Cal. Gov't Code §§ 12940(j)(1) & (k).

### SEVENTH CLAIM – CALIFORNIA LABOR CODE § 1102.5
(California Labor Code § 1102.5)

117. Plaintiff incorporates by reference all paragraphs above as though fully set forth in this claim.

118. By virtue of the foregoing, defendant retaliated against plaintiff for her complaints about acts that she reasonably believed were unlawful.

### DAMAGES

119. As a result of the actions of defendant, plaintiff has been injured and has suffered damages as follows:

   a) She has lost compensation and other employment-related benefits to which she was entitled and will lose such compensation and benefits in the future;

   b) She has suffered from emotional distress, embarrassment and humiliation, and has suffered damage to her professional reputation and standing;

  c) She has had to pay medical and other costs.

WHEREFORE, plaintiff requests that this Court grant her relief as follows:

1. Injunctive relief;

2. Compensatory damages for lost wages and benefits, in an amount to be determined;

3. Interest at the legal rate;

4. General damages for emotional distress, pain and suffering, in an amount to be determined;

5. Special damages for out-of-pocket expenses;

6. Civil penalties;

7. Attorney fees;

8. Costs of suit; and

9. Such other and further relief as the Court may deem proper.

Dated: November 6, 2020

SIEGEL, YEE, BRUNNER & MEHTA

By: ___/s/ Sonya Z. Mehta____
   Sonya Z. Mehta

Attorneys for Plaintiff
GABRIELLE NEVITT, Ph.D.

---

*Nevitt v. The Regents of the University of California*, No.
Complaint – 15